**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| DEBRA D FENDERSON on behalf of L.B.C.,     ) | |
|                                ) | |
|             Plaintiff,          ) | |
|                                ) | |
|              v.                ) | Case No. 1:14-cv-01821-TWP-TAB |
|                                ) | |
| CAROLYN W. COLVIN, Acting Commissioner     ) | |
| of the Social Security Administration,           ) | |
|                                ) | |
|             Defendant.         ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Debra D. Fenderson ("Fenderson"), on behalf of her minor child, L.B.C., requests judicial review of the final decision of the Defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), wherein the Commissioner denied her application for childhood supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §§ 423, 1381c. For the reasons stated below, the Court **REMANDS** the Commissioner's final decision.

## I. BACKGROUND

**A.**    **Procedural History**

On May 10, 2011, Fenderson applied for SSI on behalf of L.B.C., alleging disability since her date of birth, March 1, 2011. On October 6, 2011, her application was denied. On October 19, 2011, she applied for reconsideration and on July 25, 2012, her claim was denied upon reconsideration. On September 18, 2012, Fenderson requested a hearing. A hearing was held before Administrative Law Judge Monica LaPolt (the "ALJ") (Filing No. 12-2 at 36) on August 20, 2013. On September 7, 2013, the ALJ issued a decision that L.B.C. was not disabled. On September 12, 2014, the Appeals Council denied Fenderson's request for review of the ALJ's

decision, thereby rendering it the Commissioner's final decision.   On November 7, 2014, Fenderson filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**B.      Medical History**

L.B.C. was born on March 1, 2011, and was a newborn/young infant when the application for SSI was filed, and an older infant at the time of the ALJ's decision.  (Filing No. 12-2 at 19.) *See* 20 C.F.R. § 416.92a(g)(2).  The application alleged that L.B.C. suffers from mixed receptive disorder, developmental delays, seizure disorder, sleep disorder, and failure to thrive.

L.B.C. was born premature, along with her twin sister, via cesarean section.  She was kept in the hospital for three weeks before going home.  While in the hospital, L.B.C. underwent a head CT which showed a diffuse cerebral abnormality worrisome for multifocal acute infarctions or diffuse anoxic injury and possibly a tiny area of acute petechial type hemorrhage.  Dr. Debra N. O'Donnell ("Dr. O'Donnell") documented that the CT scan raised some concern but noted that L.B.C.'s physical examination revealed no asymmetry and noted that L.B.C. was making improvements in feeding.  On April 27, 2011, L.B.C. underwent an electroencephalogram (EEG) study for evaluation for seizures.  The EEG was "likely" normal for her age, with no overt epileptiform discharges identified.  However, it was noted that the possibility of a focal discharge in the right central region could not be ruled out.  Dr. O'Donnell noted that L.B.C. had no seizures upon examination.  In May 2011, Dr. O'Donnell diagnosed L.B.C. with probable complex partial seizures.  (Filing No. 12-7 at 5.)

In June 2011, when L.B.C. was three months old, Fenderson completed a questionnaire for the Disability Determination Bureau and indicated that L.B.C. was having three to five seizures per day despite taking Phenobarbital to prevent them.  (Filing No. 12-6 at 19-21.)  Additionally,

between July 2011 and February 2012, Fenderson kept a calendar accounting of L.B.C's seizure activity which totaled at least eighty-nine seizures in eight months.

In July 2011, when L.B.C. was four months old, Dr. Sandra Aspy noted that a recent change in L.B.C.'s anti-seizure medication reduced the frequency of her seizures from daily to only two times per week, each lasting about four minutes.  (Filing No. 12-7 at 20.)  In September 2011, when L.B.C. was six months old, Dr. O'Donnell noted that L.B.C. was doing better, with seizures one to two times per week or sometimes every other week.

In October 2011, when L.B.C. was seven months old, a Childhood Disability Evaluation form was completed by a Social Security Reviewing Physician, Dr. Steven E. Roush ("Dr. Roush").  Dr. Roush found that L.B.C. had a combination of impairments that were severe but did not meet, medically equal, or functionally equal the Listing of Impairments-Child Listings ("Listing").  He also noted that, although L.B.C. was having seizures once a week to every other week, he believed L.B.C.'s seizure impairment "would improve when adequate [medication] levels [were] maintained".  (Filing No. 12-7 at 86.)

On February 21, 2012, L.B.C. saw Dr. O'Donnell who noted that, while L.B.C. continued to make good developmental progress, she had increased seizure frequency from once a week to 2-3 times per week.  L.B.C. attended a consultative examination with Dr. Muhammad Saafir ("Dr. Saafir") on March 10, 2012.  The neurological examination was grossly normal in terms of muscle and power tone, and there were no gross or motor defects.  Dr. Saafir stated a diagnostic impression of seizure disorder, "not well on Phenobarbital." A laboratory study subsequent to the examination indicated that L.B.C.'s Phenobarbital level was sub-therapeutic.

On March 19, 2012, L.B.C. underwent a 24-hour video EEG.  Dr. O'Donnell's notes from the EEG indicated normal results for L.B.C.'s age, with the exception of an occasional high voltage

proximal discharge during sleep.  Further, Dr. O'Donnell's notes reflected that, "[w]hile the [discharges] may have some epileptiform characteristics, they were not definitive and their association with sleep might suggest a more benign character."

Subsequently, on March 26, 2012, L.B.C. saw Dr. O'Donnell again and reported "no further seizure events at home".  Dr. O'Donnell noted that L.B.C.'s video EEG revealed "rare frontal dominant sharp waves in sleep transitions that may be a normal variant".  Dr. O'Donnell further noted that it was unclear whether "past events were truly seizure" but opined that the resolution of clinical complaints and the EEG were both reassuring.  She further noted that L.B.C.'s sleep was poor and commented that Phenobarbital could create some hyperactivity and sleep disturbance in toddlers.  Dr.O'Donnell recommended taking L.B.C. off the medication since L.B.C. was older.

In May 2012, L.B.C. underwent a Childhood Disability Evaluation which found that she had a combination of impairments which were severe but did not meet, medically equal, or functionally equal the Listings.  (Filing No. 12-8 at 7-11.)  The evaluation further found that L.B.C. was less than marked in health and physical well-being due to her seizure disorder and limitations of the upper and lower body.

On September 11, 2012, L.B.C. again saw Dr. O'Donnell, who noted that she was "seizure free".  (Filing No. 12-9 at 26.)  Nurse Practitioner, Janet Shockley's, March 2013 progress notes also indicate that L.B.C. continued to be "seizure free" without the antiepileptic drugs "for several months".  However, at the ALJ hearing on September 7, 2013, Fenderson reported that L.B.C. was still having seizures twice a month and had a seizure the same week as the hearing.  (Filing No. 12-2 at 55.)

**C.**     <u>**The ALJ's Decision**</u>

At step one, the ALJ determined that L.B.C. had not engaged in substantial gainful activity since the application date of May 10, 2011.  At step two, the ALJ determined that L.B.C. had the following severe impairments:  mixed receptive disorder, developmental delays, seizure disorder, sleep disorder, and failure to thrive.  At step three, the ALJ determined that L.B.C. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Specifically, the ALJ determined that L.B.C's history of seizure disorder did not met or medically equal Childhood Listing 111.03 Nonconvulsive Epilepsy.

## II.  <u>LEGAL STANDARD</u>

**A.**     <u>**Disability Determination**</u>

For an individual under the age of eighteen to be eligible for SSI, a claimant must have a "disability" as defined by 20 C.F.R. § 416.924.  The Act defines child disability as a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months".  42 U.S.C. § 1382c(a)(3)(C)(i).  In determining whether a minor claimant is disabled, the Commissioner employs a three-step sequential analysis:  (1) if the claimant is engaged in work that qualifies as substantial gainful activity, he is not disabled regardless of his medical condition, age, education, or work experience; (2) if the claimant does not have a medically determinable severe impairment or combination of impairments, he is not disabled; and (3) if the claimant does not have an impairment that meets, medically equals, or functionally equals a Listing or does not meet the twelve-month durational requirement, he is not disabled.  20 C.F.R. § 416.924(a).  *See also Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007).

In considering whether a child's impairment functionally equals a Listing, the ALJ determines whether the claimant has an extreme limitation in one of the following domains or a marked limitation in two of the following domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(a); 20 C.F.R. § 416.926a(b)(1).  *See also Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007).   In determining whether such limitations exist, the ALJ must consider the interactive and cumulative effects of all the impairments, regardless of the severity.  20 C.F.R. § 416.926a(a).

## B.   <u>Review of the Commissioner's Final Decision</u>

When the Appeals Council denies review, the ALJ's ruling becomes the final decision of the Commissioner.  *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). Thereafter, in its review, the district court will affirm the Commissioner's findings of fact if they are supported by substantial evidence.  42 U.S.C. § 405(g)(2012); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Dixon*, 270 F.3d at 1176; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  *See also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (noting that substantial evidence must be "more than a scintilla but may be less than a preponderance.").

In this substantial evidence determination, the district court does not decide the facts anew, re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir.

2008); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Accordingly, if the Commissioner's decision is adequately supported and reasonable minds could differ about the disability status of the claimant, the court must affirm the decision.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Ultimately, the sufficiency of the ALJ's articulation aids the court in its review of whether the Commissioner's final decision was supported by substantial evidence.  *See Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("[t]he ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do.").  While, the ALJ need not evaluate every piece of testimony and evidence submitted in writing, the ALJ's decision must, nevertheless, be based upon consideration of all the relevant evidence.  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  In this vein, the ALJ may not discuss only that evidence that favors his ultimate conclusion but must confront evidence that contradicts his conclusion and explain why the evidence was rejected.  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

Further, the ALJ's decision must adequately demonstrate the path of reasoning, and the evidence must lead logically to the ALJ's conclusion.  *Terry*, 580 F.3d at 475; *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996).  Indeed, to affirm the Commissioner's final decision, "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion."  *Zurawski*, 245 F.3d at 888-89; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

### III.  DISCUSSION

Fenderson raises one issue on appeal.  Specifically, she argues that the ALJ failed to consider and evaluate the record evidence when deciding whether L.B.C. medically met or medically equaled Listing 111.03 Nonconvulsive Epilepsy.

The ALJ's relevant Listing determination regarding medical equivalence reads as follows:

The child claimant's history of seizure disorder does not meet or medically equal childhood listing section 111.03 *Nonconvulsive epilepsy*.  The evidence does not indicate the occurrence of more than one minor motor seizure per week, with alteration of awareness or loss of consciousness, despite at least 3 months of prescribed treatment in a child with an established seizure disorder.

(Filing No. 12-2 at 19.)

Fenderson argues that the ALJ's one-sentence explanation for her medical equivalence determination was perfunctory and did not mention or evaluate any record evidence that might support a contrary conclusion.   In particular, Fenderson notes that nowhere in the ALJ's opinion did the she mention or evaluate her seven-month calendar of L.B.C.'s seizure events.

The Commissioner responds that the ALJ's opinion was sufficient because she minimally identified the relevant Listing and provided some analysis.  Further, the Commissioner points to the ALJ's recitation of the medical history in relation to the ALJ's separate, functional equivalence determination.  Finally, the Commissioner points to other record evidence, albeit not cited by the ALJ in her opinion, which ostensibly supports the ALJ's medical equivalence determination.  The Court is not persuaded by the Commissioner's arguments.

Any reading of the ALJ's medical equivalence determination reveals an insufficient discussion of the relevant evidence.  Indeed, although the Commissioner may reasonably opine what evidence the ALJ might have relied upon, the Court cannot determine from the ALJ's one sentence analysis what evidence the ALJ actually relied upon.  As such, the Commissioner's arguments are nothing more than impermissible *post hoc* rationalizations, which the Court is not permitted to consider.  *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("principles of administrative law require the ALJ to rationally articulate the grounds for her decision;" and the Court, therefore, "confines [its] review to the

reasons supplied by the ALJ"); *Hendricks v. Astrue*, 1:08-CV-376-DFH, 2009 WL 648610, at *8 (S.D. Ind. March 11, 2009). Instead, the ALJ's decision must adequately demonstrate the path of reasoning, and the evidence must lead logically to the ALJ's conclusion. *Terry*, 580 F.3d at 475; *Rohan*, 98 F.3d at 971.

Further, as Fenderson persuasively asserts, the Court cannot tell from the ALJ's minimal reasoning whether the ALJ considered substantial record evidence that might support the opposite conclusion, like Fenderson's calendar. *See Terry*, 580 F.3d at 475 (noting that the ALJ's decision must be based upon consideration of all the relevant evidence); *Diaz*, 55 F.3d at 307 (noting that the ALJ must evaluate evidence that contradicts her conclusion and explain why the evidence was rejected).

Indeed, other courts evaluating nearly identical ALJ Step 3 determinations have similarly found remand to be warranted under the circumstances. *See, e.g.*, *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (concluding, in an Adult Listing case, that the ALJ's two sentence Listing determination was "inadequate" and warranted remand, noting that the ALJ "never affirmatively determined how many seizures he believed [the claimant] actually experienced"); *Collins v. Barnhart*, 533 F. Supp. 2d 809, 817-18 (N.D. Ill. 2008) (concluding, in an Adult Listing case, "[a]t step three, the ALJ failed to discuss any of the objective medical evidence or explain how that evidence demonstrated that claimant did not suffer from seizures more than once a month.").

Accordingly, the Court considers remand to be appropriate in order for the ALJ to evaluate and discuss the record evidence supporting her medical equivalence determination for Listing 111.03 Nonconvulsive Epilepsy, including any evidence that might support the opposite conclusion.

## IV.  **CONCLUSION**

For the reasons stated above, the Court **REMANDS** the Commissioner's final decision.


**SO ORDERED.**


Date:  12/16/2015

_Tanya Walton Pratt_
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana


DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

10